UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

ROY MITCHELL WAGGONER and
JEWEL KAY WAGGONER,                          Case No. 17-11381-ta7

    Debtors.

REBECCA L. HEIZER,

    Plaintiff,

v.                                            Adv. Pro. No. 18-01033-t

ROY MITCHELL WAGGONER and
JEWEL KAY WAGGONER,

    Defendants.

## **OPINION**

Plaintiff Rebecca Heizer brought this proceeding in June 2018, seeking a determination that Roy and Jewel Waggoner's debt to her was nondischargeable and that the Waggoners should not be granted a discharge. At trial, Heizer had dropped the nondischargeability count but asked for denial of discharge on two grounds: an alleged fraudulent pre-petition transfer of property and alleged false oaths. Both grounds related to a pre-petition sale, for $30,000, of land in Carlsbad, New Mexico.

It is undisputed that the Waggoners sold the property on a real estate contract a few months before they filed this case, and that they failed to schedule the contract as an asset or disclose it to the trustees assigned to this case. However, Heizer did not show that the Waggoners acted with fraudulent intent. The Court therefore concludes that the Waggoners should be granted a discharge.

## I. FACTS

The Court finds:[1]

The Waggoners live in Aztec, New Mexico. Mrs. Waggoner is a secretary for Koogler Middle School in Aztec, New Mexico. She has worked for the Aztec school district for more than 20 years. Mr. Waggoner has worked in the oil and gas industry for more than 30 years, mostly in service businesses that provide trucking, hauling, and other transportation to exploration and production companies. While Mr. Waggoner is knowledgeable about his trade, he is not versed in legal, accounting, or business administration matters. Mr. Waggoner testified at trial. His testimony was credible.

In 2012, Mr. Waggoner decided to start his own business, Pops Enterprises, LLC, in the Permian Basin area of southeastern New Mexico and west Texas. Pops was an oilfield trucking company that hauled water to and from oil rigs in the Permian Basin. It was Mr. Waggoner's opinion that the Permian Basin provided more opportunities for him than the Four Corners area.

Mr. Waggoner set up operations in Carlsbad, New Mexico. He lived onsite in a SunnyBrook RV. Mr. Waggoner would stay in Carlsbad for a few weeks at a time, go back to Aztec for a few days every now and then, and return to Carlsbad.

Pops began operations about April 1, 2012. In the beginning, it owned two trucks. From 2012 through early 2014, Mr. Waggoner expanded his business. Pops borrowed money to buy trucks and water tanker trailers. At its peak, Pops owned ten trucks.

---

[1] The Court took judicial notice of the docket in this proceeding, the main bankruptcy case (including the claims register), and crude oil price trends between 2012 and 2017. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (holding that a court may sua sponte take judicial notice of its docket); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) (same); *In re SemGroup Energy Partners, L.P., Securities Litigation*, 2009 WL 3713524, at *2 (N.D. Okla.) (taking judicial notice of Department of Energy price charts); *Grimes v. Navigant Consulting, Inc.*, 185 F. Supp. 2d 906, 913 (N.D. Ill. 2002) (taking judicial notice of stock prices found online).

Pops borrowed $195,000 from Heizer in June 2013, evidenced by a promissory note, which included interest at 8%. The Waggoners personally guaranteed payment of the note. The purpose of the loan was to buy trucks so Pops could expand its business. Pops bought two trucks with the loan proceeds.

In March 2015 the Waggoners acquired a two-acre parcel of land south of Carlsbad (the "Yard"). The Waggoners did not pay cash for the Yard. Instead, Mr. Waggoner made improvements to contiguous property so the owner could move a mobile home onto it and live there. Mr. Waggoner estimated that he spent about $24,000 improving the owner's property. In exchange, the owner deeded the Waggoners the Yard on March 26, 2015. Pops used the Yard to park and maintain its trucks, trailers, and other equipment. Mr. Waggoner also parked his RV at the Yard.

In September 2015 the Waggoners bought another two acre parcel of land near the Yard. It does not appear to have been used by Pops.

Starting in mid-2014, the price of crude oil fell sharply, causing a severe downturn in the Permian Basin. Pops' business fell off over time and its operating losses mounted. Mr. Waggoner worked very hard to get Pops through the downturn as a going concern. He was not able to do so.

On or about January 1, 2017, Pops ceased operating. In February 2017 the Waggoners sold the Yard to Jerold and Stephanie Campos for $30,000 on a real estate contract (the "Real Estate Contract"). Monthly payments were $500. The parties signed a document entitled Notice of Escrow Contract. The Camposes signed the document on February 16, 2017 while the Waggoners signed on March 8, 2017. The notice was recorded in the Eddy County records on April 26, 2017. Under the deal, the Camposes received any personal property that remained on the Yard. That included an "EZ Shed" and three large metal shipping containers.

Around March 2017 the truck and trailer finance companies and banks repossessed their collateral. Pops or Mr. Waggoner sold three old pickup trucks to Mr. Campos for $6,000. The money was kept by the Waggoners. Mr. Waggoner sold the SunnyBrook RV to Mr. Campos' father in exchange for his agreement to take over payments on the trailer.

By April 2017 Pops had liabilities of about $1 Million and very few assets. The Waggoners filed this bankruptcy case on May 30, 2017.

The Waggoners filed their bankruptcy schedules on June 19, 2017. The schedules listed their house in Aztec, the two acre parcel purchased in September 2015, another 36-acre tract in Carlsbad, and a 57-acre tract in Gallup owned by Mrs. Waggoner, but did not include the Real Estate Contract. On the petition date the Camposes still owed about $12,000-$15,000 on the contract.[2] That amount was paid to the Waggoners post-petition.

The Waggoners attended their § 341 meeting on July 6, 2017, in Farmington, New Mexico. Their counsel appeared remotely by video or telephone. When the trustee asked if they needed to correct their schedules regarding real property, the Waggoners said no.

Heizer filed a proof of claim in the bankruptcy case on August 8, 2017, for $104,317.44.

The Waggoners amended their schedules on September 28, 2017, to add miscellaneous items of jewelry ($1,980); a Kubota tractor ($12,700); and miscellaneous irrigation and other equipment ($4,365).

On November 27, 2017, Heizer filed a motion to convert the Waggoners' chapter 13 case to chapter 7. Although the Waggoners initially objected to the motion, they eventually stipulated to a conversion order, which was entered on February 7, 2018.

---

[2] Although the Real Estate Contract called for $500 monthly payments, the Camposes made substantial prepayments.

The Waggoners and their counsel appeared at the § 341 meeting in the converted case on April 5, 2018, by video or telephone. When asked whether they had "transferred or given any property to anybody worth more than $1,000," the Waggoners said no.

The chapter 7 trustee has been active in this case. He has sold the Waggoners' house, their land in Gallup and Carlsbad, and their Kubota tractor.

Heizer filed this adversary proceeding on June 4, 2018. Her complaint asked that the Court find that the Waggoners' debt to her is nondischargeable under § 523(a)(2)[3] and that the Waggoners' discharge should be denied under § 727(a)(2)(A), (a)(3) and (a)(4)(A).[4]

On June 21, 2018, the Waggoners again amended their bankruptcy schedules, this time adding the Real Estate Contract ($30,000) to schedules B and G.

On July 24, 2018, the chapter 7 trustee deposed the Waggoners. During the deposition they discussed in detail the Yard and the Real Estate Contract.

The Court tried the proceeding on March 2, 2020. At trial, Heizer abandoned her §§ 523(a)(2) and 727(a)(3) claims but pursued her § 727(a)(2)(A) and (a)(4)(A) claims.

## II. DISCUSSION

A.   Denial of Discharge Intent Standard.

Section 727 of the bankruptcy code states, in pertinent part:

(a) The court shall grant the debtor a discharge, unless–…

    (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed–
        (A) property of the debtor, within one year before the date of the filing of the petition; or

---

[3] All statutory references are to 11 U.S.C. unless otherwise indicated.
[4] Specifically, Heizer questions the Waggoners' testimony in their § 341 meetings held on July 6, 2017 (chapter 13), and April 5, 2018 (chapter 7). Both meetings occurred before the Waggoners amended their schedules to disclose the Real Estate Contract.

. . .

>    (4) the debtor knowingly and fraudulently, in or in connection with the case–
>    (A) made a false oath or account[.]

"Both § 727(a)(2)(A) and (a)(4)[(A)] contain a wrongful intent requirement." *In re Lobera*, 2014 WL 640980, at *4 (Bankr. D.N.M.) (citing *Marine Midland Bus. Loans, Inc. v. Carey (In re Carey)*, 938 F.2d 1073, 1077 (10th Cir. 1991), and *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294 (10th Cir. 1997). "[M]ere mistake or inadvertence is not sufficient to bar a debtor's discharge under § 727." *In re Jayme*, 2018 WL 3218104, at *10 (Bankr. D.N.M.) (quoting *In re Garland*, 417 B.R. 805, 815 (10th Cir. BAP 2009)).

"Intent to deceive may be inferred from the totality of the circumstances, including a reckless disregard for the truth." *In re Cribbs*, 327 B.R. 668, 673 (10th Cir. BAP 2005) (citing *Blue Ridge Bank and Trust v. Cascio (In re Cascio)*, 318 B.R. 567, 575 (Bankr. D. Kan. 2004)); *see also Driggs v. Black (In re Black)*, 787 F.2d 503, 506 (10th Cir. 1986), abrogated in part on other grounds by *Grogan v. Garner*, 498 U.S. 279 (1991). This is so because "debtor's intent to deceive will rarely exist in the form of direct evidence." *In re May*, 579 B.R. 568, 584 (Bankr. D. Utah 2017); *see also Lobera*, 2014 WL 640980, at *4 (fraudulent intent often proved by attendant facts and circumstances).

> A finding of reckless disregard should be very narrowly interpreted because a misrepresentation is fraudulent only if the maker "knows or believes the matter is not what he represents it to be." *Chevy Chase Bank FSB v. Kukuk (In re Kukuk)*, 225 B.R. 778, 787 (10th Cir. BAP 1998), citing Restatement (Second) of Torts § 526(a) (1976).

*In re Cribbs*, 327 B.R. at 673. "The Court may infer a fraudulent intent, but there must be some facts that provide a basis for the Court to make such an inference." *In re Peeples*, 579 B.R. 254, 277 (Bankr. D. Utah 2017).

B.  § 727(a)(2)(A).

To prevail on a § 727(a)(2)(A) claim, a plaintiff must establish by a preponderance that a defendant:

1) transferred property;
2) in which the debtor has an interest;
3) within one year of the petition date;
4) with the intent to hinder, delay, or defraud [plaintiff].

*Lobera*, 2014 WL 640980, at *5.

Here, there is no dispute that the Waggoners owned the Yard and conveyed it to the Camposes within a year before they filed this case. Thus, the only question is whether the conveyance was done "with the intent to hinder, delay, or defraud." The Court concludes that there was no such intent.

Courts often consider certain so-called "badges of fraud" when determining fraudulent intent in a § 727(a)(2)(A) claim *See, e.g., In re Wreyford*, 505 B.R. 47, 58–59 (Bankr. D.N.M. 2014) (listing eleven badges of fraud); *In re Potter*, 2008 WL 5157877, at *5–*6 (Bankr. D.N.M.) (listing similar badges of fraud found in New Mexico's version of the Uniform Fraudulent Transfers Act, N.M.S.A. § 56-10-18).

The Court has considered all of the badges of fraud listed in *Wreyford*. The result is a finding of no fraudulent intent. The Camposes are not insiders of the Waggoners. There is no evidence that the price the Camposes paid was less than fair market value. There is no evidence that the Waggoners retained possession of the Yard or had an agreement with the Camposes to get the Yard back after their bankruptcy has been concluded. There is no evidence of a pattern or series of questionable transactions. Mr. Waggoner testified that he sold the Yard to the Camposes as part of his effort to wrap up his failed water hauling business. This testimony is plausible and credible. Aside from the Waggoners' failure to disclose the Real Estate Contract, considered below, Heizer

presented no evidence supporting her allegation of fraudulent intent. Rather, the evidence shows that Mr. Waggoner sold the Yard as part of his honest attempt to make the best of a very bad situation. Heizer's § 727(a)(2)(A) claim fails.

C.  § 727(a)(4)(A).

To win a § 727(a)(4)(A) claim, a plaintiff needs to prove by a preponderance, that:

(1) debtor made a statement under oath;
(2) the statement was false;
(3) debtor knew the statement was false when he made it;
(4) debtor fraudulently intended to make the statement; and
(5) the statement materially related to the debtor's bankruptcy case.

*Lobera*, 2014 WL 640980, at *5, citing *McVay v. Perez (In re Perez)*, 411 B.R. 386, 401 (D. Colo. 2009).

A false oath can be made in written submissions to the Court or under oath at a § 341 meeting or deposition:

> "A debtor's petition, schedules, statement of financial affairs, statements made at a 341 meeting, testimony given at a Federal Rule of Bankruptcy Procedure 2004 examination, and answers to interrogatories all constitute statements under oath for purposes of § 727(a)(4)[(A)]." *In re Butler*, 377 B.R. 895, 922 (Bankr. D. Utah 2006). "The same holds true for deposition testimony and testimony at other hearings during the course of the bankruptcy case." *Id.* (citations omitted). The false oath also need not be an affirmative misstatement; knowing and fraudulent omissions will also suffice. *Id.* (citations omitted).

*In re Jayme*, 2018 WL 3218104, at *9.

The only issue litigated at trial was why the Waggoners did not disclose the Real Estate Contract on their original schedules, filed in June 2017, nor to the chapter 13 and 7 case trustees in their respective § 341 meetings, but instead waited until June 21, 2018. Did the Real Estate Contract simply "slip through the cracks," or was the omission deliberate?

Reasonable minds could differ on the answer to this question. After reviewing the transcripts of the § 341 meetings and the July 2018 deposition, listening to Mr. Waggoner's trial

testimony, and observing his demeanor, the Court finds that the omission was an honest mistake rather than a dishonest concealment. Mr. Waggoner went through a lot trying to save Pops in the years after the price of oil dropped by half. He was not careful about the legal aspects of running a business—written contracts, deeds, security agreements, and the like. The Court believes Mr. Waggoner when he testified in his deposition that it did not occur to him to schedule the Real Estate Contract as an asset. Mr. Waggoner testified that he was focused on winding down Pops' business, and that with so much stress and strain in the months leading up to the bankruptcy, the Real Estate Contract was "just another one of those that we just didn't think about, I guess."

The Waggoners' lack of fraudulent intent also is supported by the fact that while they lived in Aztec, Mr. Waggoner worked in Carlsbad and their bankruptcy attorney practiced in Albuquerque.[5] This geographical separation made preparation of the Waggoners' bankruptcy schedules difficult. This is not a criticism of the Waggoners' bankruptcy counsel, but an observation that Farmington-area debtors are at a disadvantage because they often have to hire bankruptcy lawyers who are nearly 200 miles away. Had the Waggoners lived and worked in Albuquerque, they would have been able to meet with their counsel, review information, answer questions, and go over drafts of their bankruptcy schedule. In such an event, the Court believes it highly likely the Real Estate Contract would have been scheduled from the start.

Heizer's evidence of fraudulent intent, apart from the original bankruptcy schedules, is the Waggoners' testimony at their two § 341 meetings. The Court has reviewed the testimony with some care. The testimony could support a finding of either fraudulent intent or innocent omission. When coupled with Mr. Waggoner's trial testimony and the other trial evidence, however, the

---

[5] Additionally, the first § 341 meeting took place in Farmington, New Mexico, and the second in Albuquerque. The Waggoners appeared for the second meeting by video or telephone, and their counsel appeared by video or telephone for both. Based on the transcripts from these meetings, it appears the connection among the parties and counsel was not always very clear.

Court concludes that the omission was innocent. In sum, Heizer has not shown that the Waggoners omitted the Real Estate Contract from their initial bankruptcy schedules with fraudulent intent or failed to disclose the contract to the chapter 13 and 7 trustees with such intent.

### III. CONCLUSION

The Waggoners lost their business and a large source of income due to the downturn in the oil and gas market, ultimately resulting in this bankruptcy case. The losses did not stop on the petition date: the chapter 7 trustee, in accordance with his duties, sold the Waggoners' house, their other real estate, and some of their personal property. After working hard but failing to save Pops, the Waggoners sold the Yard under the Real Estate Contract as part of winding up Pops' business. The Waggoners should have listed the Real Estate Contract on their schedules and disclosed it to the case trustees, but their failure to do so was not fraudulent. The Court will enter a final judgment in favor of the Waggoners and against Heizer on the § 727(a)(2)(A) and (a)(4)(A) claims.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: April 24, 2020
Copies to: Counsel of record